[740 NYS2d 35]

THE PEOPLE OF THE STATE OF NEW YORK, Appellant, v MARIA POLANCO, Respondent.

THE PEOPLE OF THE STATE OF NEW YORK, Appellant, v ANTHONY CALABRESE, Respondent.

First Department, April 2, 2002

APPEARANCES OF COUNSEL

*Stanley R. Kaplan* of counsel (*Joseph N. Ferdenzi* on the brief; *Robert T. Johnson, District Attorney,* Bronx, attorney), for appellant.

. *Adam M. Jaffe* for Maria Polanco, respondent.

*Murray Richman* for Anthony Calabrese, respondent.

## OPINION OF THE COURT

MARLOW, J.

Defendants were jointly accused in an indictment of possessing gambling records in the first degree and of promoting gambling in the first degree, both felonies. In the same instrument, Anthony Calabrese was separately accused of one additional count of each of these crimes.

This People's appeal questions whether, based on the testimonial and tangible evidence adduced at a hearing on defendants' motion to suppress, the motion court correctly decided that the police unlawfully seized the physical evidence they found in defendants' possession at the time of their arrest. The motion court generally credited defendant Calabrese's testimony, and rejected a key portion of Detective Barry Sullivan's testimony, characterizing the latter as "tailored to nullify constitutional objections." We disagree.

On a warm afternoon on August 26, 1999, at 1:55 P.M., Detective Barry Sullivan, a six-year member of the Bronx Vice Squad, wore a T-shirt, sneakers, and a beige fishing hat with the brim turned down when he arrived at 287 East 161st Street, a Bronx storefront with the appearance of a coffee shop. He traveled there with his sergeant and three other investigators in an unmarked vehicle, having received anonymous complaints of illegal gambling at this address, where he had made gambling arrests as recently as three months earlier. After a brief wait, Sullivan saw defendant Anthony Calabrese arrive, exit his double-parked black "4 by 4," leaving the engine running, and hurriedly enter the "coffee shop." Sullivan followed Calabrese into the shop and observed approximately 15 "older people" socializing, playing cards, drinking coffee, and playing slot machines, "like a social club."

Sullivan's attention was immediately drawn to defendant Calabrese, who stood three or four feet from him in front of a counter conversing with defendant Maria Polanco on the other side. Sullivan testified that Polanco handed Calabrese, across the counter, an unsealed envelope with "161 St Thursday 8/26"

written on its face, and containing what he believed to be mutuel race horse policy slips which were partially in open view. She separately handed Calabrese a substantial quantity of folded United States currency wrapped in a rubber band. Within the rubber band Sullivan also saw a piece of paper upon which was written "106 Street" and the name "Dennis." He believed "Dennis" referred to Dennis Malazo, someone Detective Sullivan had previously arrested for his control of gambling activities at a location on 106th Street.

Armed with (1) his experience having arrested approximately 650 people for gambling crimes, (2) his gambling arrest of Maria Polanco at the same storefront location four months earlier at which time she disclosed she was "working for" Dennis Malazo, and (3) the specific numeric notations on the partially protruding wagering slips of paper which he observed from a distance of between 36 and 48 inches, he concluded that these 3 by 5½ inch partially visible slips in the 4½ by 9 inch business envelope were contraband mutuel race horse policy slips.

The only two witnesses who testified at the suppression hearing were Detective Sullivan for the People, and defendant Anthony Calabrese on his own behalf. Although their versions of this episode differed in several non-dispositive respects, they directly clashed on one point: Detective Sullivan testified that the envelope containing the protruding wagering slips was resting face down on the counter with its open flap facing upward and tucked behind the partially visible slips; and that the envelope was not sealed in any way at any time. Defendant Calabrese, on the other hand, testified repeatedly and unequivocally that the envelope, which he claimed he never touched before Sullivan arrested him, was on the counter after defendant Polanco placed it there for Calabrese, and that it was sealed shut. Calabrese's testimony thus squarely contradicted Sullivan's key testimony that he saw the illegal wagering slips protruding from inside an unsealed envelope, which was being handed by Polanco to Calabrese, seconds after he entered the store, but before arresting them.

The motion court found Detective Sullivan's testimony in this regard incredible, and instead credited defendant's account that he never touched the envelope which was at all times sealed shut.

The physical evidence included in this appellate record consists of the 4½ by 9 inch ordinary white business envelope and the approximately 126 gambling slips it housed. After

carefully examining these exhibits, the court finds they unquestionably and explicitly demonstrate that defendant's repeated testimony, that the envelope was sealed shut with its contents therefore not visible, is, simply put, false. There is absolutely no indication that the sealing glue on the flap of this ordinary, white business-size envelope, obviously still in its original state, was ever moistened or that its flap was ever sealed, stapled, taped, or otherwise securely closed. Indeed, one needs no special expertise to draw this inescapable conclusion after closely scrutinizing this exhibit.

Furthermore, contrary to defendant's adamant testimony, accepted by the hearing court, that, in his criminal experience as a "numbers runner," envelopes like the one at bar, used to carry illegal wagering slips from one location to another, are "always" sealed shut, the parties later stipulated that if Detective Freda Oquendo, the People's expert, were called she would testify that, based on her 12 years of professional experience investigating this type of criminal enterprise, envelopes under these circumstances are sometimes sealed and sometimes not. This Court's own examination of the envelope and the unlawful wagering slips found inside it further reveals that the numbers written on the slips can easily be seen—albeit partially—when the flap is positioned as described by Detective Sullivan, especially when they are eyed and judged from a mere distance of 48 inches or less.

Once Detective Sullivan saw the envelope and its contents handed from Polanco to Calabrese and having concluded that it contained illegal gambling slips, he identified himself as a police officer. Before arresting anyone, he asked Calabrese what he was doing there, and the latter replied that he was "playing a number." Sullivan then told Polanco that he recalled her telling him, during her arrest three or four months earlier, that she intended "to give up the number racket," because after so many arrests "she couldn't take going back to jail." However, she added, she was unable to find other work. Sullivan then arrested them both.

The record permits an inference that the motion court viewed with skepticism Sullivan's testimony that Polanco was unsuspecting enough to pass an envelope "stuffed with the policy" to Calabrese just when Sullivan, the very same detective who had arrested Polanco three or four months earlier, entered the store and stood about four feet from her. Confronted by the court's apparent doubts, the detective explained, "Sir, I had a hat which was disguising me and at the point in time I was stand-

ing there, she was in conversation with [Calabrese] and she had not noticed me yet and she had passed the envelope." In addition, it is undisputed that, from the moment Sullivan entered the store until he placed them under arrest, less than one minute transpired.

Appellate courts are loathe to disturb credibility assessments, particularly when a fact-finding judge, in terms as explicit as those set forth in this record, discredits a party's only witness, and instead credits, in equally clear terms, the only opposition witness. However, when the physical proof establishes unmistakably that the latter witness has testified falsely, and the former truthfully, about a key, and virtually dispositive fact, the reviewing tribunal is left with no just or appropriate alternative but to overturn the flawed decision. As we wrote in *People v Tempton* (192 AD2d 369, 370, *lv denied* 82 NY2d 760):

> "Although factual findings by the hearing court are not to be lightly disregarded, plainly unjustified or clearly erroneous findings are not to be accepted [citation omitted]. While the determination of credibility issues by the trier of facts is normally accorded great weight, this ' "rule of deference must give way when the appellate court determines that the fact findings under review are against the weight of the evidence" ' [citations omitted]."

In *Tempton*, we found that the contents of videotapes did not support a defendant's exculpatory claim that, in the police station, the arresting officer planted items of evidence in her bag. The hearing court nevertheless had accepted her testimony over that of the police officer, and suppressed the items the officer had testified he found in her bag. Accordingly, we held that "[t]he hearing court placed undue weight on what the videotape did not show [i.e., contradicting defendant] and too little weight on the testimony of the police officer" (*id.* at 371).

That same factual issue exists on this appeal where the manifest condition of the physical evidence—i.e., the envelope, which was obviously never sealed or glued shut—squarely contradicts defendant's critical claim that when the detective entered the store he could not possibly have seen the envelope's contents because the envelope was sealed shut. This is a profoundly significant point of contention, because, had Detective Sullivan been unable to see the partially protruding gambling records—as he flatly stated he could—before he arrested defendants, he would have lacked probable cause to ar-

rest them both. Consequently, as the hearing court found, the physical evidence he acquired in connection with that arrest would have been seized unlawfully and its suppression required.

Here, however, the physical evidence clearly confirms the detective was truthful—and that defendant Calabrese was lying—about the fact that the envelope was not sealed when it was handed by Polanco to Calabrese and that the contraband nature of its partially protruding wagering slips was in Sullivan's plain sight. We therefore exercise our de novo factual review power, and substitute our finding that Detective Sullivan was able to and did observe illegal wagering slips partially protruding from the envelope as Polanco passed it to Calabrese. In light of this new finding of fact, we now turn our attention to whether the evidence should be suppressed.

It is axiomatic in New York that "[u]nder the plain view doctrine, if the sight of an object gives the police probable cause to believe that it is the instrumentality of a crime, the object may be seized without a warrant if three conditions are met: (1) the police are lawfully in the position from which the object is viewed; (2) the police have lawful access to the object; and (3) the object's incriminating nature is immediately apparent [citations omitted]" (*People v Diaz,* 81 NY2d 106, 110; *accord, People v Batista,* 261 AD2d 218, 220, *lv denied* 94 NY2d 819).

Applying these principles here, it is uncontested that Detective Sullivan was lawfully on the premises when he observed the contraband in open view. Furthermore, he was lawfully in a position enabling his experienced eyes to identify the envelope and its contents as contraband, with its telling notations and protruding slips. As the United States Supreme Court noted in *Texas v Brown* (460 US 730, 743), the contraband's "distinctive character * * * spoke volumes * * * particularly to the trained eye of the officer." These facts, without more, constituted the probable cause necessary to permit the officer to seize the contraband without a warrant. However, where, as in this case, Sullivan had also recently arrested Polanco for a gambling offense on the very same premises, the police had evidence greater than the minimum amount required to satisfy the probable cause requirement.

Accordingly, the order of the Supreme Court, Bronx County, entered on or about February 1, 2001, granting defendants' motions to suppress physical evidence, after a hearing, should be reversed, on the facts, defendants' motions denied, and the case remitted for further proceedings on this indictment.

WILLIAMS, P.J., ELLERIN, LERNER and RUBIN, JJ., concur.

Order, Supreme Court, Bronx County, entered on or about February 1, 2001, reversed, on the facts, defendants' motions to suppress physical evidence denied, and the case remitted for further proceedings.